**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| STA GROUP LLC, *Plaintiff,* v. MOTOROLA SOLUTIONS, INC., *Defendant.* | §§§§§§§§§§§ | Case No. 2:23-CV-00030-JRG-RSP |

**CLAIM CONSTRUCTION ORDER**

On May 28, 2024, the Court held a hearing to determine the proper construction of the disputed claim terms in U.S. Patent No. 9,319,852 ("the '852 Patent"), U.S. Patent No. 8,145,249 ("the '249 Patent"), U.S. Patent No. 9,049,737 ("the '737 Patent") (collectively "Asserted Patents"). Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing (Dkt. Nos. 114, 121, 130)[1], having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

[1] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.

TABLE OF CONTENTS

I. BACKGROUND .......... 3

II. APPLICABLE LAW .......... 5

III. LEVEL OF ORDINARY SKILL IN THE ART .......... 11

IV. CONSTRUCTION OF AGREED TERMS .......... 12

V. CONSTRUCTION OF DISPUTED TERMS .......... 12

A. "an Internet Protocol Interoperability and Communications System (IPICS) management system" .......... 13

B. "high bandwidth connection" / "low bandwidth connection" .......... 20

C. "mixing the plurality of monitored push-to-talk communication streams into a mixed communication stream such that the audio communications communicated in each of the monitored push-to-talk communication streams can be heard on the mixed stream" / "a mixer coupled to the interface and operable to mix the plurality of monitored push-to-talk communication streams into a mixed communication stream such that the audio communications communicated in each of the monitored push-to-talk communication streams can be heard on the mixed stream" .......... 24

D. "[receive/receiving] a first determination from the [IS/interoperability server] that the [endpoint/initiating device] is not in adherence with capabilities of the predefined floor control mechanism and that a proxy is to be dynamically inserted to connect the [endpoint/initiating device] to a virtual talk group" .......... 28

E. "the predefined floor control mechanism" .......... 30

VI. CONCLUSION .......... 31

## I. BACKGROUND

Plaintiff STA Group LLC ("STA Group") alleges that Defendant Motorola Solutions Inc. ("MSI") infringes the Asserted Patents. Shortly before the start of the May 28, 2024 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion.

The '249 Patent, titled "Method and System for Providing a Proxy Media Service," was filed on November 4, 2005, and issued on March 27, 2012. The '249 Patent relates "to communication systems and, more particularly, to a method and system for providing a proxy media service." '249 Patent at 1:18–20.

The Abstract of the '249 Patent states:

> A method for providing a push-to-talk proxy media service includes receiving a plurality of monitored push-to-talk communication streams over a high bandwidth connection and mixing the plurality of monitored push-to-talk communication streams into a mixed communication stream. The method also includes transmitting the mixed communication stream to a user endpoint over a low bandwidth connection.

Claim 1 of the '249 Patent is an illustrative claim and recites the following elements:

> 1.A method for providing a push-to-talk proxy media service, comprising:
>
> receiving a plurality of monitored push-to-talk communication streams over a *high bandwidth connection*, each monitored push-to-talk communication stream comprising audio communications from a plurality of users;
>
> *mixing the plurality of monitored push-to-talk communication streams into a mixed communication stream such that the audio communications communicated in each of the monitored push-to-talk communication streams can be heard on the mixed stream*; and
>
> transmitting the mixed communication stream to a user endpoint over a *low bandwidth connection*.

The '737 Patent, titled "Multiplexing and Demultiplexing Radio Channels," was filed on December 5, 2011, and issued on June 2, 2015. The '737 Patent relates "to communication

networks, and, more particularly, to signal processing and re-using bandwidth in communication networks." '737 Patent at 1:18–20.

The Abstract of the '737 Patent states:

> In one embodiment, a method and apparatus of multiplexing and demultiplexing radio channels includes receiving data through at least one multicast media channel available for use in an Internet Protocol Interoperability and Communications System (IPICS) comprising multiple communication endpoints linkable to a Land Mobile Radio (LMR) in the IPICS; channel mapping the at least one multicast media channel to multiple media channels of the LMR; receiving an audio signal through the at least one multicast media channel; controlling access to the LMR by applying communication access control policies based on the received data upon reception of the audio signal; and operatively linking the LMR to a specified endpoint through the at least one multicast media channel based on the communication access control policies.

Claim 1 of the '737 Patent is an illustrative claim and recites the following elements (disputed terms in italics):

> 1. A method, comprising:
> receiving data in a multicast channel;
> receiving channel mapping information from an *Internet Protocol Interoperability and Communications System (IPICS) management system*;
> using the channel mapping information to map the multicast channel to a radio multicast channel;
> receiving an audio signal through the multicast channel;
> controlling access to a Land Mobile Radio (LMR) by applying a communication access control policy based on the received data upon reception of said audio signal and by sending, over a communication channel, a command for tuning, by a device, said LMR to the radio multicast channel; and
> operatively linking said LMR to an endpoint through said multicast channel based on said communication access control policy by re-streaming the audio signal from the device over the radio multicast channel to the LMR.

The '852 Patent, titled "Interoperability and Communication System Dynamic Media Proxy Based on Capability Negotiation," was filed on October 24, 2014, and issued on April 19, 2016. The '852 Patent relates "system and methodology to facilitate communication between non-

compatible communication devices by utilization of a dynamic media proxy" '852 Patent at Abstract.

The Abstract of the '852 Patent states:

> A system and methodology to facilitate communication between non-compatible communication devices by utilization of a dynamic media proxy is provided. Information associated with an endpoint, such as, media capabilities, identity and system resource information is collected. Media proxy'ing is performed as part of capability negotiation. A dynamic media proxy is employed based on an analysis of the collected information. An analysis component can identify an endpoint that does not adhere to specific rules of transmission and can dynamically connect such an endpoint to a VTG (virtual talk group) via a proxy to prevent the endpoint from transmitting media into an active VTG that already has multiple talkers streaming media. Additionally, the location where media processing can occur can be dynamically determined based on the available system resources.

Claim 1 of the '852 Patent is an illustrative claim and recites the following elements (disputed terms in italics):

> 1.An apparatus comprising a processor, wherein the processor is configured to:
>
> identify information related to an endpoint to obtain identified information; and
>
> negotiate a communication session with an interoperability server (IS) based in part on at least one of the identified information or a predefined floor control mechanism associated with the IS; and
>
> receive *a first determination from the IS that the endpoint is not in adherence with capabilities of the predefined floor control mechanism and that a proxy is to be dynamically inserted to connect the endpoint to a virtual talk group*, wherein the capabilities comprise quality of service, rules of transmission and trusted endpoint identity.

## II. APPLICABLE LAW

### A. Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

(Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (quotation marks omitted) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated,* 135 S. Ct. 1846 (2015).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim

adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*.

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id*. Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*. The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the

> "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

### B. Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

### C. Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 911. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.,* 875 F.3d 1360, 1365 (Fed. Cir. 2017). "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "a court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Ernie Ball, Inc. v. Earvana, LLC*, 502 F. App'x 971, 980 (Fed. Cir. 2013) (citations omitted). The standard "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

## III. LEVEL OF ORDINARY SKILL IN THE ART

It is well established that patents are interpreted from the perspective of one of ordinary skill in the art ("POSITA"). *See Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."). The Federal Circuit has advised that the "[f]actors that may be considered in determining the level of skill in the art include: (1) the educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field." *Env'tl Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983). "These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art." *Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

Plaintiff contends a POSITA would have had a bachelor's degree in electrical engineering, computer engineering, computer science, or a related field, and two to three years of experience in the design or development of telecommunication systems, or the equivalent. (Dkt. No. 114 at 9-10). Plaintiff also contends that additional graduate education could substitute for professional experience, or significant experience in the field could substitute for formal education. *Id.* at 10.

Defendant contends a POSITA would have had at least a B.S. degree in electrical engineering, computer science, or a similar field, plus approximately three years of industry experience in networking or communication systems or an equivalent combination of education, work, and/or experience. (Dkt. No. 121 at 10).

Having considered the parties' proposals, and the factors that may be considered in determining the level of skill in the art, the Court finds that a POSITA would have had a bachelor's degree in electrical engineering, computer engineering, computer science, or a related field, and two years of experience in the design or development of telecommunication systems, or the equivalent. The Court further finds that additional graduate education could substitute for professional experience, or significant experience in the field could substitute for formal education. The Court also finds, and the parties agree, that any differences in the parties' proposals do not appear to be significant for the purpose of claim construction. (Dkt. No. 121 at 10).

## IV. CONSTRUCTION OF AGREED TERMS

The parties agreed to the construction of the following claim terms:

| Claim Term/Phrase | Agreed Construction |
| --- | --- |
| "An apparatus comprising a processor, wherein the processor is configured to:"<br><br>'852 Patent: Claim 1 | The parties agree that the preamble is "[a]n apparatus comprising."<br><br>The parties further agree that the language "a processor, wherein the processor is configured to:" is part of the body of the claim and is a claim limitation. |
| "An endpoint comprising:"<br><br>'852 Patent: Claim 12 | Preamble is limiting. |

Dkt. No. 132-1 at 2, 4 (Joint Claim Construction Chart). In view of the parties' agreement on the proper construction of the identified terms, the Court hereby **ADOPTS** the parties' agreed constructions.

## V. CONSTRUCTION OF DISPUTED TERMS

The parties dispute the meaning and scope of six terms or phrases in the Asserted Patents. Each dispute is addressed below.

### A. "an Internet Protocol Interoperability and Communications System (IPICS) management system"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "an Internet Protocol Interoperability and Communications System (IPICS) management system" | "a system that provides internet protocol interoperability and communications" | Plain meaning, which is the Internet Protocol Interoperability and Communications System (IPICS) management system available from Cisco Systems, Inc., San Jose, Calif., USA. |

#### 1. Analysis

The term "an Internet Protocol Interoperability and Communications System (IPICS) management system" appears in Asserted Claims 1 and 7 of the '737 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties agree that the term should be given its plain meaning. The parties dispute whether the plain meaning of "IPICS management system" should be limited to the commercial IPICS product "available from Cisco Systems" known to a POSITA at the time of the invention.[3]

The specification states that Figure 1 illustrates a block diagram of an IPICS 100 comprising a management system 101, and describes the IPICS 100 as follows:

> FIG. 1 illustrates a block diagram of an IPICS 100 comprising a management system 101, which *decides which multicast addresses are available to be used by the system* 100. The management system 101 may be embodied as hardware, software, or a combined hardware/software configuration. For purposes of illustration and example, in FIG. 1, media channels (MCs) include audio plus video plus tones media. . . . A first management channel *operatively connects from the management system 101 to an endpoint* A 103. A second management channel operatively connects from the management system 101 to an endpoint B105. A third management channel operatively connects from the management system 101 to an endpoint C 107. The types of endpoints currently supported are *PMCs, IP Phones over multicast, IP and PSTN phones over IP Telephony gateway, and radios over land mobile radio gateways*. Furthermore, the IPICS 100 may support additional types of

[3] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. No. 114 at 18-24); Defendant's Responsive Claim Construction Brief (Dkt. No. 122 at 10-23); and Plaintiff's Reply Claim Construction Brief (Dkt. No. 130 at 10-13).

endpoints.




’737 Patent at 4:49–5:7 (emphasis added), Figure 1 (annotated and highlight added). As indicated, the specification indicates that the term IPICS includes a number of structures and functions. For example, the IPICS may include not only management system 101, but also may include LMR mux/demux 109, radio control service 110 (“RCS”), and control interface 115. Indeed, Claim 1 recites that channel mapping information is received from the management system, and that access is controlled to a Land Mobile Radio (LMR) by applying a communication access control policy.

Consistent with this claim language, the specification states that it is the management system 101 that provides channel mapping information, and that it is radio control service 110 (“RCS”) that applies communication access control policy. *Id.* at 6:13–15 (“The LMR mux/demux 109 uses the channel mapping information sent by the management system 101”), 7:45–48 (“[T]he radio control service [RCS] 110 intercepts the audio multicasted by IPICS endpoints on channel specific multicast groups and applies the appropriate access control policies.”).

Contrary to Defendant's contention, the description of IPICS 100 indicates that the patentees did not intend to limit the claim scope to a commercial product. If that were true, the specification would describe the product, and would not describe what a covered device "may" include or how it "may" be structured. Moreover, the specification indicates that the embodiments disclosed in the specification "are intended merely to facilitate an understanding of ways in which the embodiments herein may be practiced and to further enable those of skill in the art to practice the embodiments herein." *Id.* at 2:14–18.

Defendant correctly argues that the specification states in the background section that Cisco offered a commercial product, which it called an "IPICS." *Id.* at 1:25–30. However, the same section also states that the claimed functionality "is not possible on the current system." *Id.* at 1:49–50. Specifically, the specification describes the prior art as having a "significant limitation," because it was limited to a single multicast address. *Id.* at 1:40–45. In contrast, the specification states that embodiments of the invention may include more than one multicast. *See, e.g.*, *id.* at 7:26–29 ("If the IP endpoint is interested in receiving traffic for more than one multicast groups, it can and should explicitly subscribe to all the multicast groups it is interested in.").

This indicates that the claims did not describe, and were not intended to be limited to Cisco's commercially available IPICS. Distinguishing the prior art should not be understood as "definitional language" that requires reading the prior art commercial product into the claims. (Dkt. No. 122 at 13). Accordingly, the Court rejects Defendant's construction, and gives the term its plain and ordinary meaning.

Turning to Defendant's argument, it first argues that the term refers to a commercial product by name, because it uses the capital letters "I" "P" "I" "C" "S" for the term "Internet Protocol Interoperability and Communications System," followed by a parenthetical of "IPICS."

(Dkt. No. 122 at 12). Defendant further argues that the deliberate, redundant use of the word "System"/ "system" in this claim term indicates to a POSITA that the capitalized words ("Internet Protocol Interoperability and Communications System (IPICS)") refers to a specific commercial product by its proper name. (*Id.* at 12-13). The Court disagrees that the term should be limited as Defendant contends.

The disputed term is "an Internet Protocol Interoperability and Communications System (IPICS) *management system*." As discussed above, the recited "management system" is one of a number of structures of the disclosed IPICS 100. Furthermore, Defendant's theory of capitalization as an unmistakable indicator of proper nouns in the claims is inconsistent with other recited terms. For example, the claims also recite "Land Mobile Radio (LMR)," which Defendant's expert, Dr. Kiaei, acknowledged is a common noun notwithstanding its capitalization. (Dkt. No. 114-2 at 50:19-51:17).

Defendant also argues that the very first mention of "IPICS" in the "Background" section references "[t]he Internet Protocol Interoperability and Communications System (IPICS) available from Cisco Systems, Inc., San Jose, Calif., USA." (Dkt. No. 122 at 13) (citing '737 Patent at 1:25–27). According to Defendant, this is "definitional language," which tells a POSITA that "IPICS" means the product "available from Cisco Systems, Inc." (Dkt. No. 122 at 13) (citing *Eli Lilly & Co. v. Apotex, Inc.*, 837 F. App'x 780, 784 (Fed. Cir. 2020)). Defendant argues that the remainder of the specification discloses purported improvements to "the IPICS" commercial product "available from Cisco." (Dkt. No. 122 at 13).

For the reasons discussed above, the Court finds that this is not "definitional language." The specification describes the disclosed IPICS as encompassing numerous structures, functions, and embodiments. If the claims were describing a commercial product, it would describe the

product, and would not describe what the disclosed device "may" include or how it "may" be structured. Indeed, Dr. Kiaei acknowledged that the specification teaches that the Cisco commercial product did not perform the claimed invention. (Dkt. No. 114-2 at 40:23–41:15, 44:7–45:6).

Defendant next argues that its construction is consistent with the prosecution history. Defendant contends that to overcome the prior art, the patentees amended each of independent Claims 1 and 7 to require an "Internet Protocol Interoperability and Communications System (IPICS) management system." (Dkt. No. 122 at 13) (citing Dkt, No. 122-7 at 100, 102).[4] Defendant argues that the patentees stressed that the addition of the IPICS claim limitation distinguished the cited prior art references (Shaffer, Christenson, and Cai) that did not disclose by name the newly-claimed "IPICS management system." (Dkt. No. 122 at 14) (citing Dkt. No. 122-7 at 90-96).

Defendant further contends that the patentees repeated these arguments in their Response To Examiner's Action on April 14, 2014, emphasizing that the Cai prior art reference "does not disclose or suggest information for the mapping is received from an IPICS management system," and that the cited prior art references, "whether taken alone or in combination, fail to disclose or suggest 'receiving channel mapping information from an Internet Protocol Interoperability and Communications (IPICS) management system.'" (Dkt. No. 122 at 14) (citing Dkt. No. 122-7 at 99–108).

Defendant contends that the examiner maintained the rejections finding that the prior art references taught "a method and system of mapping multicast channels to a radio channel functionally similar to the IPICS system." (Dkt. No. 122 at 14) (citing Dkt. No. 122-7 at 59–98). Defendant also argues that the examiner further recognized that "[t]he IPICS limitation" added to

---

[4] Issued Claims 1 and 7 correspond to application Claims 22 and 31

the claims did "not change the lack of novelty of the invention" because it refers to the "admitted prior art" described in the Background of the specification. (Dkt. No. 122 at 14) (citing Dkt. No. 122-7 at 63).

Defendant argues that the patentees responded by requesting another Examiner Interview, and challenged the examiner's assertion that the prior art "combination is 'functionally similar' to the recited IPICS system." (Dkt. No. 122 at 14-15) (citing Dkt. No. 122-7 at 57). Defendant contends that the patentees further argued that, "[e]ven assuming an IPICS system was known," the prior art references and Background did not disclose receiving channel mapping information "from an IPICS system" as claimed. *Id.* Defendant further argues that in a response dated December 18, 2014, the patentees stressed the significance of the IPICS limitation, arguing that "the Office Action provided no evidence to support its assertion that a combination of Shaffer, Christenson, and Cai would have rendered obvious a system functionally similar to the IPICS management system" as recited in the amended claims. (Dkt. No. 122 at 15) (citing Dkt. No. 122-7 at 2-13).

According to Defendant, a POSITA reviewing this prosecution history would have understood that the patentees repeatedly distinguished the prior art as failing to disclose receipt of "channel mapping information" from a "management system" identified by name. (Dkt. No. 122 at 15). Defendant further argues that the claims as amended were different, because they necessarily require receipt of "channel mapping information" from an "IPICS management system," which a POSITA would recognize as the product "available from Cisco Systems, Inc., San Jose, Calif., USA." (Dkt. No. 122 at 15) (citing Dkt. No. 122-1 at ¶¶ 59–76).

The Court disagrees that the prosecution history indicates that the term IPICS should be limited to the IPICS available from Cisco Systems, Inc., San Jose, Calif., USA. Contrary to

Defendant's argument, the patentees did not distinguish the prior art based on a brand name. Defendant's argument incorrectly assumes that the recited term "an Internet Protocol Interoperability and Communications System (IPICS) management system" is a brand name. As discussed above, the intrinsic evidence describes the recited IPICS as encompassing numerous structures, functions, and embodiments. More importantly, the patentees explicitly argued on multiple occasions that the prior art failed to disclose receiving channel mapping information from an Internet Protocol Interoperability and Communications System (IPICS) management system. (Dkt. No. 122-7 at 96, 106-107, 57, 11). Indeed, this was the language added to Claims 22 and 31. (Dkt. No. 122-7 at 100, 102).

The examiner did characterize the IPICS as "admitted prior art" that did "not change the lack of novelty of the invention." (Dkt. No. 122-7 at 63). The patentees responded that even assuming "an IPICS system was known, the Background section of Applicants' specification does not disclose or suggest it was known to receive channel mapping information in such a system." (Dkt. No. 122-7 at 57). In other words, the patentees did not argue for the commercial embodiment of an IPICS management system available from Cisco Systems, Inc., San Jose, Calif., USA. In fact, the patentees explicitly argued that the prior art did not disclose or suggest the limitation added to the claims. This is the exact opposite of arguing for a commercial product, and is not a clear disavowal of claim scope. *Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.") (citing *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002)). Moreover, the Notice of Allowability specified the examiner's reasons for allowing the claims, and it was not because the claims included a commercial embodiment. (Dkt. No. 130-1 at 18).

Finally, Defendant argues to the extent that the Court finds any ambiguity in the intrinsic evidence, then the Court should consult the extrinsic evidence. (Dkt. No. 122 at 15-16) (citing Dkt. No. 122-9 at 10:21–13:16, 40:2–41:5; Dkt. No. 122-1 at ¶¶ 52–97; Dkt. No. 122-2 at 56:22-57:11; 50:19-56:21). The Court does not find any ambiguity within the intrinsic evidence. More importantly, the extrinsic evidence cited by Defendant is at best redundant of the Background section of the '737 Patent, because it purports to acknowledge that Cisco offered an IPICS. This is exactly what the specification states, and it is not disputed that Cisco offered an IPICS.

What is lacking from Defendant's argument is any contention that the Cisco commercial product disclosed in the Background section of the '737 Patent performed the recited limitation and/or that the patentees contended it did. Instead, Dr. Kiaei acknowledged that the specification teaches that the Cisco commercial product *did not* perform the claimed invention. (Dkt. No. 114-2 at 40:23–41:15, 44:7–45:6). Accordingly, the Court rejects Defendant's construction, and gives the term its plain and ordinary meaning.

**2. Court's Construction**

For the reasons set forth above, the terms **"an Internet Protocol Interoperability and Communications System (IPICS) management system"** is given its **plain and ordinary meaning.**

**B. "high bandwidth connection" / "low bandwidth connection"**

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "high bandwidth connection" | Plain and ordinary meaning. | Indefinite. |
| "low bandwidth connection" | Plain and ordinary meaning. | Indefinite. |

**1. Analysis**

The term "high bandwidth connection" appears in Asserted Claims 1, 4, 10, 12, 13, 16, 22,

24, and 38 of the ’249 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The term “low bandwidth connection” appears in Asserted Claims 1, 10, 13, 22, and 38 of the ’249 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the terms are indefinite.[5]

Defendant contends that the claims and the specification do not provide reasonable certainty on how “high” is different than “low.” (Dkt. No. 122 at 23). Defendant argues that this makes both terms vague and ambiguous, because either term could possibly mean any number of different bandwidths and kinds of connections. *Id.* Defendant further argues that the specification implies that sometimes a local area network (LAN) connection could be high bandwidth and a wide area network (WAN) connection could be low bandwidth. *Id.* at 24 (citing ’249 Patent at 2:34–46, 4:16–17, 16:57–58, 17:11–15, 17:24–30, 20:13–17, 22:22–27). Defendant contends that the specification never states what specific LAN/WAN bandwidths or connections are “high” or “low” bandwidth connections. *Id.*

Defendant concedes that the specification draws some distinction between “high” and “low” bandwidth connections, but argues that this distinction is ambiguous because it is unclear what is a low-bandwidth WAN or a high bandwidth LAN. Defendant argues that courts have found terms qualified by “high” or “low” to be indefinite, when there is no objective way to tell what is “high” or “low.” *Id.* at 25 (citing *U.S. Well Servs., Inc. v. Halliburton Co.*, No. 6:21-CV-367-ADA, 2022 WL 819548, at *8 (W.D. Tex. Jan. 17, 2022); *Baxter Int’l, Inc. v. Becton, Dickinson & Co.*, No. 17-CV-7576-JHL, 2020 WL 5191495, at *12–13 (N.D. Ill. Mar. 18, 2020)). Defendant also

[5] The parties’ arguments for this disputed term can be found in Plaintiff’s Opening Claim Construction Brief (Dkt. No. 114 at 13-16); Defendant’s Responsive Claim Construction Brief (Dkt. No. 122 at 23-28); and Plaintiff’s Reply Claim Construction Brief (Dkt. No. 130 at 5-9).

argues that the specification adds more confusion by mentioning many different types of networks and connections such as "cellular, IP, PSTN, CDMA, GSM, TDMA and satellite," but does not explain which have "low bandwidth connections" or "high bandwidth connections." *Id.* at 25-26 (citing '249 Patent at 6:6–10, 6:19–25, 10:59–63, 15:54–61).

Defendant further argues that its expert, Dr. Kiaei, confirms that the meaning of these two terms would not be reasonably certain to a POSITA, and these terms could mean any number of things. *Id.* at 26. Dr. Kiaei opines that a POSITA would have understood that network "bandwidth" in the context of the '249 Patent means "an amount of data, measured in bits per second, that a communications system can transfer over a particular period of time." (Dkt. No. 122-1 at ¶ 45). Defendant argues that it is impossible for a POSITA understand what is meant by "high bandwidth connection" and "low bandwidth connection," because there are no objective boundaries provided in the specification. (Dkt. No. 122 at 26) (citing Dkt. No. 122-1 ¶¶ 44, 46–47). Dr. Kiaei further opines that the few examples provided in the specification would have been insufficient to enable a POSITA to determine what constitutes a "high bandwidth connection" or "low bandwidth connection" with reasonable certainty, because there is overlap in bandwidths between LANs and DSL/WANs. (Dkt. No. 122-1 at ¶ 47).

Defendant essentially argues that the claims are indefinite, because the specification does not numerically specify which bandwidths would be considered "high" or "low." Defendant may be correct, if the specification was required to provide mathematical precision. However, "a patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1347 (Fed. Cir. 2022) (citing *Guangdong Alison High-Tech Co. v. Int'l Trade Comm'n*, 936 F.3d 1353, 1359 (Fed. Cir. 2019)). To show that the claims are invalid, Defendant must prove by clear and

convincing evidence that the claims, "read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Contrary to Defendant's contention, the intrinsic evidence provides the required objective boundaries for these two terms.

Specifically, the specification indicates that a low bandwidth connection is a "connection that is capable of communicating only a single stream." For example, the specification states that "a low bandwidth network … is only able to effectively communicate audio from one PTT VTG channel at one time." '249 Patent at 17:5–7. Likewise, the specification describes endpoint 203 in Figure 5 as "receiving a single stream 225 that comprises communications originating from a plurality streams." *Id.* at 18:15–18. The specification states that "if the user selects channel B, then PMS 220 may receive communication streams 224 each communicated on a different channel, mix them into one stream 225 and transmit this stream to endpoint 203 on selected channel B." *Id.* at 18:31–35. This is an example of providing "a user connected over a low bandwidth WAN similar functionality and services for monitoring, communicating and with controlling a plurality of PTT VTGs as that provided to a user connected through a high bandwidth LAN." *Id.* at 20:13–17.

The specification further provides an objective boundary for a high bandwidth connection by stating that "the low bandwidth network is not able to effectively communicate the plurality of monitored PTT VTG communications in a separate stream for each VTG (e.g., in some cases this may include eight streams) as can be done for endpoint 205 accessing the IS through a LAN's high bandwidth connection." '249 Patent at 17:7–12. Accordingly, a POSITA would understand that a "high bandwidth connection" is a "connection that is capable of communicating a plurality of

separate steams."

In summary, the specification provides a non-limiting example of "a low bandwidth WAN" and a "high bandwidth LAN." Defendant concedes that the specification does not use this example to delineate the difference between a high bandwidth connection and a low bandwidth connection. (Dkt. No. 122 at 25-26). As the Federal Circuit held, "[t]he test for indefiniteness is not whether infringement of the claim must be determined on a case-by-case basis. Instead, it is whether a claim 'inform[s] those skilled in the art about the scope of the invention with reasonable certainty.'" *Nevro Corp. v. Boston Sci. Corp.*, 955 F.3d 35, 39 (Fed. Cir. 2020) (citing *Nautilus*, 572 U.S. at 910). Here, a POSITA having an understanding of the stated goals of the '249 Patent, and reading the patent claims and specification, would understand with reasonable certainty what constitutes a high bandwidth connection and what constitutes a low bandwidth connection. Accordingly, Defendant failed to prove by clear and convincing evidence that the terms are indefinite.

#### 2. Court's Construction

For the reasons set forth above, the Court construes the term **"high bandwidth connection"** to mean **"connection that is capable of communicating a plurality of separate steams,"** and the term **"low bandwidth connection"** to mean **"connection that is capable of communicating only a single stream."**

### C. "mixing the plurality of monitored push-to-talk communication streams into a mixed communication stream such that the audio communications communicated in each of the monitored push-to-talk communication streams can be heard on the mixed stream" / "a mixer coupled to the interface and operable to mix the plurality of monitored push-to-talk communication streams into a mixed communication stream such that the audio communications communicated in each of the monitored push-to-talk communication streams can be heard on the mixed stream"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
| --- | --- | --- |
| "mixing the plurality of monitored push-to-talk communication streams into a mixed communication stream such that the audio communications communicated in each of the monitored push-to-talk communication streams can be heard on the mixed stream" / "a mixer coupled to the interface and operable to mix the plurality of monitored push-to-talk communication streams into a mixed communication stream such that the audio communications communicated in each of the monitored push-to-talk communication streams can be heard on the mixed stream" | Plain and ordinary meaning. | "mixing the plurality of monitored push-to-talk communication streams into a mixed communication stream such that the audio communications communicated in each of the monitored push-to-talk communication streams can be heard on the mixed stream simultaneously |

**1. Analysis**

The phrase "mixing the plurality of monitored push-to-talk communication streams into a mixed communication stream such that the audio communications communicated in each of the monitored push-to-talk communication streams can be heard on the mixed stream" appears in Asserted Claim 1 of the '249 Patent. The phrase "a mixer coupled to the interface and operable to mix the plurality of monitored push-to-talk communication streams into a mixed communication stream such that the audio communications communicated in each of the monitored push-to-talk communication streams can be heard on the mixed streams" appears in Asserted Claim 13 of the '249 Patent. The Court finds that the phrases are used consistently in the claims and are intended to have the same general meaning in each claim. The parties dispute whether the term "simultaneously" should be read into the claims, as Defendant proposes.[6] Under Defendant's construction, different communication streams would have to be heard at the same time.

[6] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. No. 114 at 17-18); Defendant's Responsive Claim Construction Brief (Dkt. No. 122 at 29-30); and Plaintiff's Reply Claim Construction Brief (Dkt. No. 130 at 9-10).

Defendant argues that its construction reflects the plain and ordinary meaning of these two "mixing" claim terms. (Dkt. No. 122 at 29). According to Defendant, the requirement that each stream can be heard simultaneously is confirmed by the prosecution history. *Id.* Defendant contends that to overcome prior art, the patentees amended the claims to include the limitation "such that the audio communications communicated in each of the monitored push-to-talk communication streams can be heard on the mixed stream." *Id.* at 30 (citing Dkt. No. 122-5 at 42 (Claim 1 amendment), 45 (Claim 13 amendment), 55–56 (applicants remarks that amendments overcome prior art)). Defendant further contends that to distinguish the prior art reference Löppönen (U.S Patent No. 7,386,000 (Dkt. No. 122-6)), the patentees argued that "the user still hears only one group at a time," and therefore failed to teach this claim limitation. (Dkt. No. 122 at 30) (citing Dkt. No. 122-5 at 36).

Defendant also argues that in response to the examiner's rejection, the patentees argued that in Löppönen "[t]here is no such mixed stream of audio communications of multiple streams in Löppönen because only one group can be heard at a time." (Dkt. No. 122 at 30) (citing Dkt. No. 122 at 8, 37). Defendant contends that its construction is "largely from applicants' own patentability arguments to the Examiner." (Dkt. No. 122 at 30). The Court is not persuaded by Defendant's arguments.

Defendant's construction reads the term "simultaneously" into the claims. However, the term "simultaneously" does not appear in the prosecution history, and the patentees did not argue that the mixed stream had to be heard simultaneously. Instead, the patentees argued that the prior art failed to disclose "receiving a plurality of push-to-talk streams where each stream comprises audio communications from a plurality of users and *mixing the streams into a mixed stream such that the audio communications can be heard on the mixed stream.* There is no such *mixed stream*

*of audio communications of multiple streams* in Löppönen, because only one group can be heard at a time." (Dkt. No. 122-5 at 36-37) (emphasis in original). Simply stated, the patentees argued that the prior art did not disclose the mixed stream.

Contrary to Defendant's contention, the patentees' argument is reflected in the plain language of the claim, which requires that each of the communications be heard on the mixed stream. Adding "simultaneously" would improperly limit the scope of the patent, and would be inconsistent with the purpose of the invention to "facilitate interoperable PTT communications among PTT half-duplex endpoints and a full duplex endpoint through, for example, an interoperability system." '249 Patent at 3:54–57. The examiner agreed with the patentees' argument that the prior art did not disclose a mixed stream. Dkt, No. 122-5 at 7-8. To be sure, while the communications may be heard on the mixed stream simultaneously, they are not limited to "simultaneously," because there may be instances where that would make the communications indecipherable. Indeed, the specification discusses "controlling the floor" for the very purpose of having communications transmitted to and received by others. (*See, e.g.*, '249 Patent at 11:54–56, 11:64–12:1, 12:21–27, 12:30–33, 13:27–29, 14:42–51, 15:19–23). Accordingly, the Court rejects Defendant's construction.

**2. Court's Construction**

For the reasons set forth above, the phrase **"mixing the plurality of monitored push-to-talk communication streams into a mixed communication stream such that the audio communications communicated in each of the monitored push-to-talk communication streams can be heard on the mixed stream,"** and the phrase **"a mixer coupled to the interface and operable to mix the plurality of monitored push-to-talk communication streams into a mixed communication stream such that the audio communications communicated in each of**

**the monitored push-to-talk communication streams can be heard on the mixed stream"** are given their **plain and ordinary meaning.**

### D. "[receive/receiving] a first determination from the [IS/interoperability server] that the [endpoint/initiating device] is not in adherence with capabilities of the predefined floor control mechanism and that a proxy is to be dynamically inserted to connect the [endpoint/initiating device] to a virtual talk group"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "[receive/receiving] a first determination from the [IS/interoperability server] that the [endpoint/initiating device] is not in adherence with capabilities of the predefined floor control mechanism and that a proxy is to be dynamically inserted to connect the [endpoint/initiating device] to a virtual talk group" | Plain and ordinary meaning. | "[receive/receiving] a first determination from the [IS/interoperability server] both that the [endpoint/initiating device] is not in adherence with capabilities of the predefined floor control mechanism and that a proxy is to be dynamically inserted to connect the [endpoint/initiating device] to a virtual talk group" |

#### 1. Analysis

The phrase "[receive/receiving] a first determination from the [IS/interoperability server] that the [endpoint/initiating device] is not in adherence with capabilities of the predefined floor control mechanism and that a proxy is to be dynamically inserted to connect the [endpoint/initiating device] to a virtual talk group" appears in Asserted Claims 1, 8, and 12 of the '830 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the term "both" should be added to the claim language, as Defendant proposes.[7]

Defendant argues that the construction should require receiving two things: (1) "that the

[7] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. No. 114 at 11-12); Defendant's Responsive Claim Construction Brief (Dkt. No. 122 at 35-36); and Plaintiff's Reply Claim Construction Brief (Dkt. No. 130 at 5).

[endpoint/ initiating device] is not in adherence with capabilities of the predefined floor control mechanism," and (2) "that a proxy is to be dynamically inserted to connect the [endpoint/initiating device] to a virtual talk group." (Dkt. No. 122 at 35). Defendant contends that the claim language requires the received "a first determination" to have both of these things. *Id.* Defendant further argues that its construction states (and clarifies) that this received "first determination" (as opposed to any other "determinations" received) has both of these things. *Id.*

Plaintiff states that it agrees with Defendant that the term "and" is conjunctive. (Dkt. No. 114 at 12). Plaintiff opposes Defendant's construction to the extent that it is seeking to import sequential or temporal limitations through its addition of the word "both" into its construction. *Id.* Defendant responds that it "is not seeking to import any such limitations." (Dkt. No. 122 at 35). Defendant argues that it only seeks to clarify that the "first determination" that is received from the interoperability server has both things recited by the claim language as indicated by the conjunctive "and." *Id.* at 36. Plaintiff argues that Defendant's construction is unnecessary and only serves to introduce confusion to the claim language. (Dkt. No. 114 at 12).

Since the parties agree on the scope of the claim language, the Court will give the phrase its plain and ordinary meaning. Indeed, the claim language is unambiguous and is easily understandable by a jury. *Aventis Pharms., Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) ("There is a heavy presumption that claim terms are to be given their ordinary and customary meaning."). Moreover, as indicated in the briefing discussed above, the parties do not have an actual dispute. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."). Accordingly, the phrase is given its plain and ordinary meaning.

### 2. Court's Construction

For the reasons set forth above, the phrase **"[receive/receiving] a first determination from the [IS/interoperability server] that the [endpoint/initiating device] is not in adherence with capabilities of the predefined floor control mechanism and that a proxy is to be dynamically inserted to connect the [endpoint/initiating device] to a virtual talk group"** is given its **plain and ordinary meaning.**

## E. "the predefined floor control mechanism"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "the predefined floor control mechanism" | Plain and ordinary meaning. | Plain meaning, which is the predefined floor control mechanism associated with the IS. |

### 1. Analysis

The term "the predefined floor control mechanism" appears in Asserted Claims 1, 8, and 12 of the '830 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the plain meaning requires "the predefined floor control mechanism associated with the IS," as Defendant contends.[8]

Plaintiff argues that Defendant's construction simply parrots what is already in the claim. (Dkt. No. 114 at 13). Plaintiff contends that the parties do not dispute this term should have its plain and ordinary meaning. (Dkt. No. 130 at 5). Defendant argues that the parties do not dispute that the term "the predefined floor control mechanism," having the definite article "the," should be afforded its plain meaning. (Dkt. No. 122 at 36). According to Defendant, that plain meaning includes all limitations added to the term within the claim, including that this mechanism is

[8] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. No. 114 at 13); Defendant's Responsive Claim Construction Brief (Dkt. No. 122 at 36); and Plaintiff's Reply Claim Construction Brief (Dkt. No. 130 at 5).

"associated with the IS," as recited in the claim. *Id.*

The Court finds that the claim language is clear, and does not require construction. For example, Claim 1 of the '830 Patent recites the following:

> 1.An apparatus comprising a processor, wherein the processor is configured to:
> identify information related to an endpoint to obtain identified information; and
> negotiate a communication session with an interoperability server (IS) based in part on at least one of the identified information or *a predefined floor control mechanism associated with the IS*; and
> receive a first determination from the IS that the endpoint is not in adherence with capabilities of *the predefined floor control mechanism* and that a proxy is to be dynamically inserted to connect the endpoint to a virtual talk group, wherein the capabilities comprise quality of service, rules of transmission and trusted endpoint identity.

'830 Patent at Claim 1 (emphasis added). As illustrated, each independent claim recites "predefined floor control mechanism" twice. The indefinite article "a" introduces "predefined control floor mechanism" for the first time within the claim. This provides antecedent basis for this term later in the claim, which states that this mechanism is "associated with the IS[.]" Thus, the claim language indicates that the use of "the predefined floor control mechanism" refers back to the earlier term. Accordingly, the Court gives the term its plain and ordinary meaning.

### 2. Court's Construction

For the reasons set forth above, the term **"the predefined floor control mechanism"** is given its **plain and ordinary meaning.**

## VI. CONCLUSION

The Court adopts the constructions above for the disputed terms of the Asserted Patents. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the parties

should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**SIGNED this 10th day of July, 2024.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE